**AFFIRMED AS MODIFIED and Opinion Filed March 4, 2020**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-19-01217-CV**

## IN THE INTEREST OF D.C., J.C. III, J.C., AND J.C., CHILDREN

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-12-06457**

# MEMORANDUM OPINION

Before Chief Justice Burns, Justice Whitehill, and Justice Schenck
Opinion by Justice Whitehill

In this parental rights termination case, the trial court terminated Mother's rights to four

children based on the jury's findings that

- Family Code § 161.001(b)(1)(D) (dangerous conditions or surroundings) was satisfied and termination was in the children's best interest,

- Family Code § 161.001(b)(1)(E) (dangerous conduct) was satisfied and termination was in the children's best interest,

- Family Code § 161.001(b)(1)(O) (failure to comply with court order) was satisfied and termination was in the children's best interest, and

- Mother did not prove the Family Code § 161.001(d) (excused non-compliance) defense by a preponderance of the evidence.

On appeal, Mother challenges the legal and factual sufficiency of the evidence to support

these findings, but she did not preserve any factual sufficiency challenges in the trial court, nor did

she preserve legal sufficiency challenges to the § 161.001(b)(1)(O) finding, the best interest

findings, or the § 161.001(d) finding.  Because those findings suffice to support the judgment, we affirm.  However, we vacate the § 161.001(b)(1)(D) finding because it is supported by legally insufficient evidence.  Thus, we affirm the judgment as modified.

## I. BACKGROUND

We draw these facts from the trial evidence and the clerk's record as appropriate.

### A. Events Before This Termination Case

Mother gave birth to a daughter, D.C., in May 2010, and a son, J.C. III, in July 2011.

The next year, the State sued to establish their father's parent–child relationship and to compel him to pay child support.

In March 2015, Mother birthed twins, a boy and a girl, each with the initials J.C.  When Mother and the twins left the hospital they went to the residence of Mother's friend Nicole Armstrong.  Armstrong's daughter, Anastasia Mason, testified that Mother left about three days later, leaving the twins with Armstrong.  According to Mason, the twins stayed with Armstrong from then on, except for one overnight visit with Mother.

In April 2017, the Department received a referral that D.C. and J.C. III were suffering from physical neglect and neglectful supervision, including that they were not eating and were dirty and homeless.

Six months later, D.C. and J.C. III's case was assigned to Melanie LaCour, a CPS family based safety service worker.  Family based safety services is a CPS program that works with parents to try to keep children in the home.

LaCour testified that when she got the case Mother was homeless and had previously left D.C., J.C. III, and the twins to stay with Armstrong.  Mason, however, testified that Mother did not leave D.C. and J.C. III with Armstrong permanently until March or April 2018.

According to LaCour, CPS knew from prior cases that Mother had a history of substance abuse. LaCour offered Mother individual counseling, substance abuse treatment, and random drug testing. Mother completed most of the individual counseling, and she failed to complete it only because the Department's contract with that counselor ended. Mother submitted to some, though not all, of the requested drug tests, and she tested positive for cocaine and marijuana. She did not do the substance abuse counseling. The Department requested a psychological evaluation, but Mother did not submit to it while LaCour had the case.

Although the Department helped Mother seek housing, by January 2018 she was facing eviction for nonpayment of rent. That month, Mother told LaCour and her supervisor that she planned to move to Colorado with her children to be with a friend "who was part of the Mexican cartel."[1]

The Department subsequently filed this case.

**B.    Events During This Case**

**1.    Events Leading to Foster Care**

In June 2018, the Department (i) sued to terminate Mother's and Father's parental relationships with the twins and (ii) moved to modify in the 2012 case seeking to terminate the parents' relationships with D.C. and J.C. III. Ultimately the suits were consolidated and tried together in August 2019.

An August 24, 2018 temporary order required Mother to participate in (i) individual counseling, (ii) parenting classes, (iii) random drug testing, (iv) a psychological evaluation, and (v) a psychiatric evaluation. It also authorized Mother to have weekly supervised visits with the children.

---

[1] Mother denied saying that she had a friend in Colorado who had been with the Mexican cartel.

CPS caseworker Blonde Web was assigned to the case from September 6, 2018, to June 3, 2019. She testified that the children were initially placed with Armstrong and Mason and that the court ordered that the children remain with Armstrong.

The night of September 6, 2018, Web learned that D.C. and J.C. III had been removed from their school and their whereabouts were unknown.

The next day, Web and LaCour went to Mother's house. They found a car sitting in the driveway with a Hispanic family inside and "marijuana was coming out of the car."

Then Mother emerged from the house. Mother and her boyfriend were angry, and police officers were summoned. Web testified that Mother said that "she went and got her children to show CPS that she can remove her children any time feel [sic] she feels like it." Eventually the police took the children to a CPS office.[2] The children were going to be returned to Armstrong, but then CPS learned that Armstrong had failed a drug test.[3] So at that point all four children were removed and placed in foster care.

### 2.     Mother's Noncompliance with Court Orders and Other Misconduct

Web testified that Mother failed to comply with the court-ordered services in several respects. Specifically, Mother was discharged from two individual counseling providers for nonattendance. She finally started participating in individual counseling in May 2019 when CPS found her a counselor who would visit Mother in her home. Mother made three appointments to have her psychological evaluation and did not appear for any of them. And she did not appear for any of the monthly drug tests that Web requested of her.

Additionally, at trial Mother admitted to using marijuana in January, February, and March 2019. She also admitted that she had not submitted to random drug testing. When asked why not,

---

[2] Mother testified that the police told her that she could keep the children, but instead she "politely gave them back."

[3] There was also evidence that Mother said in open court that Armstrong used marijuana, but it is not clear when this happened. The record suggests it was around August 2018.

she first answered, "I just haven't," and then explained that she would have gotten fired for leaving her job for a drug test.

Furthermore, Mother acknowledged that she lived "[a] lot" of different places in 2018. She moved into a house for which the monthly rent was $3,500, and then she moved out three or four months later.

Moreover, she admitted threatening her caseworker, but she insisted that the caseworker was threatening her too.

### 3. Specific Examples of Mother's Erratic or Delusional Behavior

Trial evidence supported these events and incidents:

In September 2018, Mother appeared in court and became argumentative and defiant. When the judge spoke about ordering a psychological evaluation, Mother refused and began to orally threaten bodily harm to everyone present, including the judge. The bailiffs arrested her and took her away.

A CPS visitation monitor called security once during a supervised visit because Mother violated the rules by trying to talk to the children about the court case.[4] After Mother ignored two warnings, the monitor called security. At that point, the children were crying and saying they did not want Mother to go to jail. When CPS staff tried to get the children out of the room, Mother held onto D.C. and would not let go, creating a tug-of-war situation between Mother and the CPS supervisor. Mother also told the security officer that she was a Mason and could get everyone fired.

On another occasion, Mother gave the children cards that the visitation monitor described as things like AARP membership cards and sample credit cards, and Mother told the children that they were real credit cards. She told them that each card had $100 on it, and she even gave the

---

[4] Mother denied discussing the case with the children.

children personal identification numbers to use with them.[5]  The children later complained that they tried to use them and they weren't real credit cards.

Web testified that at one hearing Mother claimed to be earning $8,000 per month from a business she ran, which led the trial judge to withdraw Mother's court-appointed attorney.  Two months later, Mother was in court again, and she claimed that her only income was about $780 per month in social security disability payments.

Web also testified that at a February 5, 2019 hearing, Mother said that she was pregnant with a February 20 delivery date.  Web, however, could not tell whether Mother was actually pregnant.  At a subsequent hearing on or about February 16, Mother told the court that she had delivered twins and had just been discharged and came straight to court.  But during her trial testimony Mother said that in February 2019 she gave birth to twin girls at home with a midwife.

Regardless, Web testified that the Department opened a case for the new twins but that she was never able to find them or substantiate their existence while she was on the case.

Similarly, caseworker Nicole Bell, who took over the case after Web retired, testified that she didn't believe the new twins existed.

Betty Canon, a counselor who began visiting Mother in the home in May 2019, testified that she was not aware that Mother had made comments about having a second set of twins in February 2019.

For her part, Mother testified that she smoked marijuana while she was supposedly pregnant with the second set of twins because she was so upset that her children had been taken away, and moreover her doctor said it was okay for her to smoke a certain amount while she was pregnant.  She also said that she hid the new twins "[b]ecause CPS snatches everything" and that she had no photos of the new twins on her cellphone because she had just gotten it.

---

[5] Mother denied that she told the children that there was money on the cards or that she gave them PINs.

Bell testified that she met with Mother right after the case was reassigned to her. The meeting did not go well. Mother did not want to engage and talk about Mother's services, and she refused to sign a release of information that Bell requested. Then Mother became fixated on Web, saying that she had gotten Web fired by calling in complaints about her. However, Bell testified that Web actually retired from the Department.

Mother complained that D.C. and J.C. III were wearing worn out shoes after they were placed in foster care. But Web testified that CPS responded by investigating every item of clothing the children had and found no holes in any of the clothes. In fact, the children wore brand new clothes to their visits with Mother because they went into foster care with nothing and their foster parent had to buy them clothes.

Mother also complained that her younger daughter told her that she had been slapped while she was at daycare. Web, however, testified that CPS investigated this complaint and found nothing to corroborate it.

Mother also reported that she thought D.C. had been sexually abused while she was in foster care. In contrast, Web testified that CPS conducted a full investigation and found nothing to substantiate the allegations.

Mother testified that all four children have the same father and that she found out shortly before trial that Father was dead. Mason, however, testified that she knew that Father was still alive and that he was currently living with his mother.

### 4. Opinion Testimony from Mother's Counselor and Caseworkers

#### a. Canon

Psychotherapist Betty Canon started counseling Mother in May 2019, and they had roughly ten to twelve counseling sessions by the time of trial.

In roughly their third session, Canon realized that Mother had increasing signs of paranoia and delusional thoughts. For example, Mother repeatedly claimed that her father had died and left her an inheritance of over $30,000, but she never showed Canon any evidence or proof of this; and Mother would get irritated and not want to talk about it when Canon suggested she could use that money to buy furniture or do other things.

Canon also thought that Mother's claim that she once made $8,000 per month was possibly part of her delusional thinking.

Another delusion was that CPS simply disrupted Mother's happy home and that she took no responsibility for it.

According to Canon, Mother's delusions (i) impair her from making good decisions, (ii) keep her from acting rationally, (iii) hinder her from doing the things she wants or needs to do, and (iv) get in the way of her accomplishing her own goals.

Canon also testified that Mother's failure to complete her services was not Mother's fault because part of her delusion is that she has already completed her services except for counseling.

Canon further testified that she would not recommend returning the children to Mother because (i) Mother could not ensure a stable environment for them; (ii) Mother's inability to distinguish between fantasy and reality could subject the children to a "chaotic existence"; and (iii) Mother was not capable of exercising mature judgment to take care of them.

### b. Web

On the other hand, Caseworker Web disagreed that Mother was delusional; in her words, "What I have observed has nothing to do with delusion." Instead, Web explained that:

> What we have observed and witnessed of [Mother] is anger, outburst, lost [sic] of control because her children are in foster care and nobody is listening to her story and wanting to give her children back. That's not delusional. That's, I no longer have my control. So I'm going to be optionally [sic] defiant. And I'm going to act out when I feel like it. There have been times [Mother] would come to that office on Thursday and she would participate, play with her children, act appropriately,

play games, have food. And then there has been times when she come in there chaos and rage. So, again, it just depends on what she feels like she wants to do.

Web did not think Mother was struggling with psychological and psychiatric issues. Although she did not think all of Mother's decisions resulted from conscious choice, she opined that Mother had the ability to complete her service plan and did not make a good faith effort to do so.

Nonetheless, like Canon, Web would not recommend returning the children to Mother because that would threaten the children's health and safety. She also opined that it was not in the children's best interest to be returned to Mother.

### c. Bell

Caseworker Bell opined that Mother did not display the ability to parent four children simultaneously. She thinks Mother struggles with mental health issues, but she would not agree that Mother is delusional because "[she] seems to function quite well." On the other hand, she thought that Mother's claim to have had twins in February 2019 was not true and might be a delusion or "more of an attention seeking venture." Bell did not think returning the children to Mother was in their best interest. Instead, she thought permanency would be best for the children, which here required termination of Mother's rights.

### d. Coleman

CASA volunteer Haylee Coleman testified that she was on this case from the beginning and visited the children monthly. She did not think it was in the children's best interest to be returned to Mother.

### 5. The Foster Placement

The children were placed with their current foster placement in December 2018, some eight months before trial.

Caseworker Web testified that she thought the children were in a good foster home because (i) the foster mother is nurturing and gives them structure; and (ii) the children were in therapy,

and all their basic needs are being met. And when Web retired in June 2019, the foster mother was adoption motivated if the opportunity arose.

Caseworker Bell testified that (i) the children were thriving with their foster mother; (ii) the foster home is very nice; (iii) the children are on schedule with their medical and dental check-ups; and (iv) CPS's long-term plan for the children was adoption by their foster mother.

CASA volunteer Coleman testified that the children seemed comfortable and were doing well in their foster home and that their foster mother was adoption motivated.

## C.    Jury Findings and Judgment

In answer to the jury charge's first three questions, the jury found by clear and convincing evidence that

1.    Mother knowingly placed or knowingly allowed the children to remain in conditions and surroundings that endangered their physical or emotional well-being, and termination of her rights was in the children's best interest.

2.    Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, and termination of her rights was in the children's best interest.

3.    Mother failed to comply with a court order that specifically established the actions necessary for her to regain her children who were in the Department's conservatorship for at least nine months as a result of the children's removal under Chapter 262 for abuse or neglect of the children, and termination of her rights was in the children's best interest.

*See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O); *id.* § 161.001(b)(2). The jury also answered "No" to question four, which asked if Mother had proved by a preponderance of the evidence that (i) she was unable to comply with specific provisions of the court order and (ii) she made a good faith effort to comply with the order and her failure to comply was not attributable to any fault on her part. The jury was unanimous in all its answers.

Based on the verdict, the trial court rendered judgment terminating Mother's and Father's parent–child relationships with all four children. Only Mother appealed.

–10–

## II. ERROR PRESERVATION

Mother raises seven points of error on appeal:

1. The evidence was legally and factually insufficient to support the jury's best interest finding.

2. The evidence was legally and factually insufficient to support the jury's endangerment finding under Family Code § 161.001(b)(1)(D).

3. The evidence was legally and factually insufficient to support the jury's endangerment finding under Family Code § 161.001(b)(1)(E).

4. The evidence was legally and factually insufficient to support the jury's finding under Family Code § 161.001(b)(1)(O).

5. The evidence was legally and factually insufficient to support the jury's rejection of Mother's inability to comply defense.

6. The evidence was legally and factually insufficient to rebut the presumption that the children's best interest would be served by preserving the parent–child relationship.

7. The evidence presented did not meet the standard that due process requires to protect Mother's fundamental rights.

**A.      Mother's factual sufficiency points are not preserved.**

In a jury case, factual sufficiency issues must be preserved by new trial motion. TEX. R. CIV. P. 324(b)(2); *In re M.M.*, No. 05-19-00329-CV, 2019 WL 4302255, at *6 (Tex. App.—Dallas Sept. 11, 2019, pet. denied) (mem. op.).

Here, Mother did not file a new trial motion. Accordingly, her factual sufficiency challenges were not preserved, and we will not review them. *See In re M.M.*, 2019 WL 4302255, at *6.

**B.      Mother's legal sufficiency points are preserved only as to the jury's § 161.001(b)(1)(D) and (E) endangerment findings.**

In a jury case, a legal sufficiency argument can be preserved by: (i) a motion for instructed verdict, (ii) a motion for judgment notwithstanding the verdict, (iii) an objection to a jury question's

–11–

submission, (iv) a motion to disregard a jury's answer to a vital fact issue, or (v) a new trial motion. *Id.* As discussed below, Mother successfully invoked only option (iii).

To begin, Mother did not move for judgment notwithstanding the verdict, to disregard any jury findings, or for a new trial.

Next, when the State rested, Mother moved for an instructed verdict on her § 161.001(d) defense of inability to comply with a court order. But she proceeded to introduce evidence after the trial court denied her motion, which means her motion preserved nothing for review. *See Home Reader Serv., Inc. v. Grappi*, 446 S.W.2d 95, 100 (Tex. App.—Dallas 1969, writ ref'd n.r.e.); *accord Meek v. Onstad*, 430 S.W.3d 601, 610–11 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Finally, at the jury charge conference, Mother's lawyer made the following objection:

> I object to questions one and two and at this point I would like to move for a directed verdict on the D and E grounds as there was no evidence presented to show that my client knowingly placed the children in danger or with persons that would endanger the children.

When the State responded that these grounds were supported by evidence that Mother left the children with Armstrong, who was using drugs, Mother's lawyer responded, "There was no evidence of that, that that would endanger the children." But Mother's lawyer did not mention question 3's termination ground (O) or the children's best interest. The trial court overruled Mother's objection.

Jury question 1 asked if (i) Mother committed the endangerment conduct described in § 161.001(b)(1)(D) and (ii) termination was in the children's best interest. Question 2 asked if (i) Mother committed the endangerment conduct described in § 161.001(b)(1)(E) and (ii) termination was in the children's best interest. And question 3 asked if (i) Mother committed the non-compliance conduct described in § 161.001(b)(1)(O) and (ii) termination was in the children's best interest. In this context, we conclude that Mother's charge objection was limited to legal sufficiency challenges as to the endangerment conduct described in § 161.001(b)(1)(D) and (E).

Thus, she did not preserve a legal sufficiency challenge to the jury's finding that she committed the conduct described in § 161.001(b)(1)(O), nor did she preserve such a challenge to the jury's best interest findings.

Accordingly, we overrule points of error one, four, and five, and the factual sufficiency points within points of error two and three, for lack of preservation.

## C. Mother's sixth point of error is not preserved.

Mother's sixth point of error urges that the evidence was legally and factually insufficient to rebut the presumption that the children's best interest would be served by preserving the parent–child relationship. Again, this legal and factual sufficiency point was not preserved for the reasons stated in parts II(A) and (B) above.

Specifically, Mother's argument under point of error six urges that the presumption in favor of continuing the parent–child relationship controls unless evidence is introduced that staying with a natural parent is not in the child's best interest, citing our opinion in *Director of Dallas County Child Protective Services Unit of Texas Department of Human Services v. Bowling*, 833 S.W.2d 730, 732 (Tex. App.—Dallas 1992, no writ). This argument is essentially a restatement of point of error one's challenge to the jury's best interest findings. But to the extent point of error six is different, it was not preserved because Mother did not raise the presumption in the trial court. *See* TEX. R. APP. P. 33.1(a)(1). We overrule the sixth point of error.

## D. Mother's seventh point of error asserts that we must review the (D) and (E) endangerment findings.

As for point of error seven, Mother's argument clarifies that this point is raised solely to ensure that we comply with *In re N.G.*, 577 S.W.3d 230 (Tex. 2019) (per curiam), which holds that we must address challenges to findings under § 161.001(b)(1)(D) and (E) even if we affirm a termination judgment on other (b)(1) grounds. Because Mother preserved her legal sufficiency

–13–

challenges to the (D) and (E) findings, we comply with *In re N.G.* below. To that extent, we sustain Mother's seventh point of error for the reasons discussed in part III.

## E.  Conclusion

Because we overrule Mother's points challenging the findings that (i) Mother committed the non-compliance conduct described in § 161.001(b)(1)(O), (ii) termination of her rights is in the children's best interest, and (iii) she failed to prove her § 161.001(d) defense, we affirm the judgment terminating Mother's parent–child relationships with the children.

## III.  ANALYSIS OF (D) AND (E) FINDINGS

If a trial court terminates a parent's rights based on Family Code § 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other (b)(1) grounds. *See In re N.G.*, 577 S.W.3d at 235–37; *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam); *In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (per curiam). Accordingly, we proceed to review Mother's legal sufficiency challenges to the jury's endangerment findings under § 161.001(b)(1)(D) and (E).

## A.  Standard of Review

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof applies in termination cases. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the matter to be proved. FAM. CODE § 101.007.

In a legal sufficiency review, we credit evidence that supports the verdict if a reasonable factfinder could have done so, and we disregard contrary evidence unless a reasonable factfinder could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). We consider all the

evidence and defer to the factfinder's determinations as to witness credibility. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). However, we do not disregard undisputed facts that do not support the verdict, because doing so could skew the analysis of whether there is clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under the clear and convincing evidence standard, "even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d at 113. If no reasonable factfinder could form a firm belief or conviction that the matter to be proved is true, the evidence is legally insufficient. *Id.*

## B. Point of Error Two: Is the evidence legally insufficient to support the § 161.001(b)(1)(D) finding?

Yes, the evidence is legally insufficient to support the § 161.001(b)(1)(D) finding because there is no evidence that Mother knowingly placed or allowed the children to remain endangering surroundings by leaving them with Armstrong.

The Family Code allows for termination if a parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." FAM. CODE § 161.001(b)(1)(D). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.). A child is endangered when the child's environment, including living conditions and the parent's conduct in the home, creates a potential for danger that the parent is aware of but consciously disregards. *Id.*

Mother argues that the only evidence relevant to the children's environment under § 161.001(b)(1)(D) is the evidence that she left the children in Armstrong's care. Although there is evidence that Armstrong failed a drug test for marijuana around September 2018, Mother

nevertheless argues that this does not rise to the level of clear and convincing evidence that the environment endangered the children's well-being. We agree.

The Department does not dispute that Mother's decision to leave the children in Armstrong's care is the only possible evidentiary basis for the § 161.001(b)(1)(D) finding, but it states that the trial evidence included evidence that Mother herself was the one who alerted the Department by saying in open court that Armstrong smoked marijuana, thus leading to Armstrong's drug test.

The Department further argues that illegal drug use by those around a child is sufficient to support a finding that the child's surroundings endanger his or her physical or emotional well-being. *See In re M.M.*, 584 S.W.3d 885, 890 (Tex. App.—Amarillo 2019, pet. denied) ("Illegal drug use and criminal activity support a conclusion that the child's surroundings endanger his or her physical or emotional well-being."); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical and emotional well-being.").

But "a finding of endangerment based on drug use alone is not automatic." *In re C.V.L.*, No. 05-19-00506-CV, 2019 WL 6799750, at *9 (Tex. App.—Dallas Dec. 13, 2019, pet. filed). Rather, "[t]he party seeking termination must still present clear and convincing evidence of the child's actual physical surroundings or conditions that were created by the [allegedly] endangering conduct to satisfy the requirements of subsection (D)." *Id*.

Here, the evidence about Armstrong's marijuana use falls short of showing that Mother knowingly placed or allowed the children to remain in endangering surroundings, for two reasons:

First, there is no evidence to show that Armstrong's residence was an endangering environment for the children. For all the record discloses, it is possible that Armstrong rarely used

marijuana and did not do so at home or around the children. And we cannot disregard the undisputed fact that the trial court initially placed the children with Armstrong once this termination case was filed, which does not suggest that Armstrong's home was a dangerous environment for the children. *See id.*

Second, there is no evidence showing that Mother knew about Armstrong's marijuana use when she left the children with her. Although Mother said in open court that Armstrong smoked marijuana, Mother made this statement months after she had left the children in Armstrong's care. Thus, we conclude that the evidence that Armstrong smoked marijuana is legally insufficient to support the finding that that Mother knowingly placed or allowed the children to remain in endangering surroundings.

Although the parties do not mention it, we note based on our review of the entire record that the evidence concerning the initial referral to the Department is arguably some evidence of the § 161.001(b)(1)(D) condition. According to CPS employee LaCour, in April 2017 the Department received a referral that D.C. and J.C. III were suffering from physical neglect and neglectful supervision. It was reported that D.C. and J.C. III were not eating and were dirty and homeless. Evidence that those children were homeless arguably supports an inference that they were in surroundings that endangered their physical or emotional well-being. However, we conclude that this evidence of homelessness is legally insufficient to support the jury's answer to question 1, for two reasons:

First, absent an objection, we must evaluate the evidence's sufficiency according to the charge as given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, the charge asked whether Mother knowingly placed or allowed "the children," meaning all four children involved in this case, to remain in endangering surroundings. There is no evidence that the two youngest children were ever homeless, so the evidence that the two oldest children may once have been

–17–

homeless is no evidence that all four children were ever homeless or in endangering surroundings for that reason.

Second, we conclude that the hearsay evidence that the two oldest children were once homeless is not enough to "produc[e] a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d at 113. The evidence came in through witness LaCour, who received the case via reassignment six months after the April 2017 referral. She further testified that the previous case worker was no longer with "the agency," and that person did not testify at trial. Thus, we have no evidence explaining the nature of the homelessness report—such as whether it was anonymous and whether it came with substantiating details—and no evidence whether the Department was able to confirm the report.

Although LaCour testified that when she received the case in October 2017, "they were still homeless," her subsequent testimony clarified that only Mother was still homeless because by then she had left D.C. and J.C. III in Armstrong's care. So we have no evidence to confirm the hearsay report that the two oldest children were once homeless or to show that Mother "allowed [them] to remain in" that condition before leaving them with Armstrong.

For all these reasons, we conclude that the evidence supporting the jury's § 161.001(b)(1)(D) finding is legally insufficient. We sustain Mother's second point of error.

## C. Point of Error Three: Is the evidence legally insufficient to support the § 161.001(b)(1)(E) finding?

No, the evidence is legally sufficient to support the § 161.001(b)(1)(E) finding, because there was evidence that Mother repeatedly used marijuana during this case's pendency.

Family Code § 161.001(b)(1)(E) allows for termination if a parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." FAM. CODE § 161.001(b)(1)(E).

Again, to "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re C.J.B.*, 2019 WL 3940987, at *6. This termination ground requires more than a single act or omission; it requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court may consider conduct occurring both before and after a child was born to establish a "course of conduct." *Id*. Specific danger to a child's well-being may be inferred from a parent's misconduct alone. *Id*. A parent's conduct that subjects a child to a life of uncertainty and instability endangers that child's physical and emotional well-being. Id.

Our recent *In re C.V.L.* opinion provides the controlling legal principle. *See* 2019 WL 6799750, at *8. In that case, the parent in question was a father who used methamphetamine at least twice, including once during the pendency of the termination case. We upheld the trial court's § 161.001(b)(1)(E) finding against a legal sufficiency challenge "because illegal drug use after a child's removal or during the pendency of a termination proceeding is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)." *Id*.

Here, Mother admitted that she used marijuana in January, February, and March 2019—all during the pendency of this termination case. Moreover, Mother's refusal to submit to any of the monthly drug tests that caseworker Web requested of her also supports an inference that Mother was using illegal drugs during this case's pendency. Under *In re C.V.L.*, the evidence is legally sufficient to support the jury's § 161.001(b)(1)(E) finding.

Accordingly, we overrule Mother's third point of error.

## IV. DISPOSITION

We vacate the finding, which is recited in the trial court's judgment, that Mother has knowingly placed or knowingly allowed the children to remain in conditions and surroundings that

endanger the physical or emotional well-being of the children. We affirm the judgment as modified.

/Bill Whitehill/<br>
BILL WHITEHILL<br>
JUSTICE

191217F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE D.C., J.C. III, J.C., AND J.C., CHILDREN

No. 05-19-01217-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-12-06457.
Opinion delivered by Justice Whitehill. Chief Justice Burns and Justice Schenck participating.

In accordance with this Court's opinion of this date, we **VACATE** the following finding in the trial court's Judgment on Verdict of Jury and Decree of Termination: "The Court finds that ASHLEY NICOLE ELLIS has knowingly placed or knowingly allowed the children to remain in conditions and surroundings which endanger the physical or emotional well-being of the children[.]" We **AFFIRM** the judgment as modified.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered March 4, 2020.